UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:07-CR-92 |
| V. | ) | (Varlan / Shirley) |
| | ) | |
| FRANCISCO MORALES ANGELES, and | ) | |
| JOSE SANCHEZ, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case came before the Court for an evidentiary hearing on two motions to suppress evidence on November 19, 2007. At that time, the Court received testimony and exhibits for consideration. Francisco Angeles was present at the hearing with his counsel, Tracy Smith. Jose Sanchez was present with his counsel, Mike Whalen. Assistant United States Attorney Tracy Stone represented the government. At the conclusion of the hearing, the parties requested time to submit post-hearing briefs incorporating the record at the hearing. The final of these briefs was filed December 10, 2007. The Court took these matters under advisement December 11, 2007. For the reasons stated herein, the Court respectfully recommends to the District Court that Francisco Morales Angeles' Motion to Suppress Statement [Doc.38] be denied; and that Jose Sanchez' Motion to Suppress [Doc. 22] be denied.

# I: FACTS

At the evidentiary hearing, the Court heard testimony of two witnesses: FBI Special Agent Glenn Gregory and FBI Special Agent Angelo Guzman. Two exhibit documents were introduced into evidence as exhibits to the testimony. Only the testimony of the first witness pertains to defendant Jose Sanchez, as follows.

## A.  FBI Special Agent Glenn Gregory

### 1.)  Direct Examination

*Background and Involvement in the Case*

For the past 11 years, FBI Special Agent Glenn Gregory (Gregory) has been assigned to a joint operation of the FBI and the Houston Police Department aimed at the investigation of drugs and violent crimes in the Houston area. Before coming to that position, Gregory served eight years on active duty with the Marines. The FBI office in Knoxville, Tennessee contacted Gregory to help in an investigation, the arrest of Jose Sanchez and Francisco Angeles, both wanted by authorities in the Eastern District of Tennessee on charges of car jacking, kidnaping and other crimes.

*Arrest of Jose Sanchez*

In the afternoon of July 14, 2007, Gregory was at a taco stand on Beachnut Street in Houston, Texas, when he saw a man who looked like Angeles. The man (who turned out to be an unrelated Mr. Zuniga) got into a Toyota Forerunner driven by a man who looked like Sanchez. Agents observed the vehicle as it left the taco stand and followed it for one block before stooping the car. An unmarked police unit activated blue lights and pulled the vehicle over in a CVS pharmacy parking lot.

*Sanchez' Statement*

Gregory testified that he did not ask the men any questions at the CVS parking lot and neither did anyone else. Sanchez was taken to the FBI field office for booking. Gregory completed the booking himself, which took about 30 minutes. Along with Houston Police Sergeant John Clark, Gregory then took Sanchez into an interview room where the officer explained the facts of the complaint to Sanchez and asked him whether he wanted to give a statement.

Gregory spoke only English to Sanchez; Gregory does not speak Spanish. Sanchez did not try to speak Spanish at any point during his interaction with Gregory. Gregory described that Sanchez "spoke just fine." Gregory advised Sanchez of the charges and Sanchez acknowledged that he understood. Sanchez' reaction was that he wanted to talk about what was said in the complaint, and in response Gregory provided him an advice of rights form.

At this point in his testimony, Gregory identified a document as that same advice of rights form and it was introduced as Exhibit 2 to the hearing. Gregory testified that Sanchez wrote the place, date and time on the appropriate spaces at the top of the advice of rights form. Gregory watched Sanchez sign the document, indicating a waiver of the rights described. Gregory signed as a witness, as did Clark. Sanchez himself initialed each right listed on the form with a "JS." When he first handed the form to Sanchez, Gregory asked the defendant to read the form aloud to him. Gregory stated that he does not read the form to a person he interviews, he has that person read the form to him Sanchez read each and every part of the form aloud with no trouble, and exhibited no problem reading. Sanchez acknowledged he understood each line and, as he went through the form, he initialed each line indicating he understood that line. Sanchez indicated he understood all the contents of the waiver of rights form except that he could not pronounce and did not know the word

"coercion" on the form. Gregory recalled his explanation that "coercion" meant "to feel forced to speak to myself and Sergeant Clark." Sanchez then stated he understood before going on. After going over the form aloud, Gregory told Sanchez "if you understand and you want to speak to me sign," and he did.

Gregory testified that in Houston, Hispanic or Latin persons comprise more than half the population, making up the largest racial group in the area. Gregory reported that he has interacted with hundreds of individuals of Hispanic or Latin origin during the course of his work in Houston. Gregory testified that there is no way to tell if a Hispanic person in Houston speaks English, Spanish or both languages. Gregory explained, "that is the primary reason I make them read that form aloud to me." Gregory said that if he believes a person with whom he is trying to communicate speaks only Spanish, he will "reach out to someone who does" for assistance. Gregory testified that this is what he had to do in the arrest of co-defendant Angeles in August 2007.

Gregory testified that Sanchez proceeded to identify a photograph of a female as Claudia Paez, the girlfriend of co-defendant Morales Angeles (also known as "Paco"). Gregory asked Sanchez to write out his identification on the backside of the picture. Sanchez said he did not know how to write "Paco's girlfriend" in English and asked Gregory for help. Gregory did not help Sanchez, but instead told Sanchez it was okay to write it out in Spanish, which he did. Sanchez also told Gregory that "Paco" was also known as "Diablo" ("Devil" in English) and "Diablo Z21." Sanchez told Gregory that the "Z21" is a the reference to the Zetas, and a rank within that

organization.[1]  Sanchez also identified the photograph of co-defendant Morales Angeles and wrote in Spanish that he was also known as "Diablo Z21."

Gregory testified that the Sanchez interview lasted about two hours, during which Sanchez gave statements about the charges in this district as well as an abduction investigation in Tulsa, Oklahoma.  An memorialization of the interview, identified as an "FBI Form 302," was introduced as an exhibit for the purpose of demonstrating Sanchez' facility with English.  Gregory described that Sanchez' statement regarding the Knoxville charges included detail and assignment of blame. Gregory confirmed again that all this conversation was had in English.  Gregory testified that the only time Sanchez had a problem with English was at the word "coercion" on the rights form.

Gregory identified FBI form 302 as his seven-page report of the Sanchez interview.  He discussed the content of the interview and Sanchez' statements regarding his own involvement in the Knoxville abduction and the abduction in Tulsa.  All Sanchez' statements and description were made in English.  Gregory affirmatively testified that he held no doubt of Sanchez' ability to understand English, although he had some difficulty with writing in English.

*Arrest of Francisco Morales Angeles*[2]

Gregory next testified as to the circumstances of the arrest of Angeles in a Houston apartment on August 6, 2007, pursuant to the criminal complaint and arrest warrant issued in the Eastern District of Tennessee.  Gregory learned Angeles was at an apartment and officers went there for the purpose of arresting him.  An officer named Eddie Chavez knocked on the apartment door,

---

[1] Gregory explained the Zetas are known to be the enforcement arm of the Gulf Cartel, a Mexican crime syndicate involved in drug trafficking, he also explained that the 21 indicated Morales Angeles' position in the chain of command or rank.

[2] Francisco Morales Angeles is hereinafter referred to as "Angeles."

it was opened by one of the occupants and Chavez saw Angeles sitting on a couch inside. Angeles saw the police and moved out of the door's line of sight. The officers pushed their way inside and arrested Angeles "without incident." At the scene of the arrest, the officers conversed with Angeles in English.

Gregory conducted the booking of Angeles, conversing with him in English throughout. Gregory described the charges lodged in the Eastern District of Tennessee to the defendant, who wanted to talk about the alleged incident. Gregory showed Angeles two items. The first was a photograph of the alleged victim, Garcia, to which Angeles responded that he knew the man in the picture. Second, Gregory showed Angeles a surveillance picture of himself taken at a check cashing business, to which Angeles responded, "yeah, that's me." Angeles started talking about the charges, but Gregory stopped him in order to advise Angeles of his <u>Miranda</u> rights in Spanish. Gregory contrasted this with his earlier interaction with Sanchez, who he believed to have a better command of the English language.

As to Angeles, Gregory described that at this point, the officer "shut him down" on telling his story. Gregory requested the help of a Spanish-speaking officer. These event occurred on a weekend and a Spanish-speaking officer had to be called in from home. FBI Agents Orlando Munoz and Angelo Guzman responded and arrived in about an hour. Gregory gave a brief description of the situation to the two arriving agent and provided them a copy of the criminal complaint. After that time, Gregory was not actively involved in Angeles' statement; he checked in on the interview "a couple of times" and noted that they were then speaking Spanish.

## 2.) Cross Examination

### A. Jose Sanchez

Attorney Whalen questioned Gregory on cross-examination, at which time the following additional testimony was elicited. The size of the room where the interview of Sanchez took place was 15 feet by 20 feet. Gregory interviewed Sanchez on July 14, 2007, but did not transcribe his notes until July 18, 2007. Gregory's original notes of the interview were sent to the Knoxville FBI office along with the entire investigative file compiled by Houston authorities. At the time he spotted Sanchez, Gregory was conducting surveillance in the area of the taco stand with various police units. The Houston FBI office is equipped with audio and video recording capability, but Gregory did not use these in his interview with Sanchez because it is not FBI policy to record interviews. Gregory testified that he did not tell Sanchez that he himself spoke Spanish. Sanchez began indicating that he had something to say to the police at the scene of his arrest. Gregory concluded Sanchez spoke and understood English from his reading the rights form in English, speaking to Gregory in English at the scene of the arrest and during booking. Gregory confirmed that the FBI office where Sanchez was interviewed had Spanish rights forms available, but that he did not provide one of these to Sanchez. Gregory testified that during an earlier interview with Claudia Paez in the Houston jail, Paez informed police that Sanchez speaks English, and the information received from the Knoxville FBI office also indicated Sanchez speaks English, thus he did not give him a Spanish rights waiver form.

Gregory testified that while he could have called in an interpreter to assist him, given the totality of all the information available to the officer he believed it was not necessary. When asked whether he had any concerns after Sanchez could not write the description on the photograph,

Gregory testified that it is not uncommon that people have no trouble verbalizing something in English, but cannot write the same. Gregory has no special training in language and uses his own observation and experience to determine whether a person can speak English. He was also asked whether just because Sanchez could pronounce the words that would necessarily mean that Sanchez understood the words. Gregory testified that he specifically asked Sanchez if he understood and he said that he did. Gregory also testified that based on his observation of Sanchez' speaking at the scene of his arrest, during the booking process and throughout the interview, taken with the information Gregory had received from Knoxville and Paez, it was clear Sanchez could understand English.

## B. *Francisco Morales Angeles*

Attorney Smith cross-examined Gregory about the description "without incident" attached to his description of Angeles' arrest. Gregory said that by this he meant that Angeles did not resist arrest. The officers on the scene of the arrest (about 10 - 12) did display their guns as they entered the apartment. Angeles left the scene with police about a half hour after his arrest. It took about 15 minutes to travel to the FBI office from the scene of the arrest. Gregory testified that Angeles' booking took about 45 minutes to an hour. This was longer than Sanchez' booking time of 30 minutes because at the time Angeles was being booked an Amber Alert was issued and some resources of the field office were devoted to that alarm. When asked whether Angeles was under the influence of anything at the time of his arrest, Gregory stated that "it did not appear to me that he was." Attorney Smith asked whether Angeles expressed extreme thirst and asked for a drink. Gregory responded, "maybe to someone else, not to me." Angeles was advised of the car jacking and kidnaping charges, and, according to Gregory, "didn't seem surprised." Angeles was asked

about his immigration status and advised that he had been previously deported and that he was born in Mexico.

### 3.) Re-Direct Examination

Upon further questioning by AUSA Stone, Gregory confirmed that has made the assessment of whether a person can speak English hundreds of times during his work in Houston, observing the person's demeanor and behavior.

### B.  FBI Special Agent Angelo Guzman

### 1.) Direct Examination

*Background and Involvement in the Case*

The government next called FBI Special Agent Angelo Guzman (Guzman) to testify. Guzman testified to the following information.  Guzman is assigned to the FBI Houston field office, having been there about nine months at the time of his testimony.  Guzman was born in Puerto Rico, but has lived in the United States since age three.  Guzman served as assistant public defender in Miami, Florida before joining the FBI where he has been for over 24 years.  Guzman speaks fluent Spanish and has used that ability in his FBI work, having been assigned as an agent to San Juan, Puerto Rico and Bolivia.  Guzman was one of the agents who responded to Gregory's call for assistance in the interview of Francisco Angeles following his arrest.

*Angeles Statement*

Guzman identified Exhibit 1 as a Spanish advice of rights form (FD 395).  He compared that form with an English version, Exhibit 2, and stated that their contents are "exactly the same."  Guzman testified he read each and every right listed on the Spanish version of the rights waiver form to Morales Angeles and made sure that he understood each one.  The signature at the bottom was

made by defendant Morales Angeles. Guzman testified defendant Morales Angeles stated he understood his rights and the waiver. Guzman recalled that he placed a special emphasis on the last of the listed rights, making especially sure that Angeles understood that this was not a permanent waiver, but that he could stop the conversation at any time (he did this due to his public defender background). Guzman then allowed time for Angeles to read the rights to himself, which he appeared to do before looking up at Guzman to continue. Guzman asked Morales Angeles if he understood and the defendant said that he did. Guzman then asked Angeles whether he was willing to talk to the officers without an attorney present. Angeles answered that he was. Guzman then told him, "okay, then go ahead and sign the form."

Guzman started the interview with background questions, then covered the Knoxville car jacking events. Guzman testified that Angeles gave a detailed statement regarding this incident. Guzman said that he believes the other Spanish-speaking agent with him may have showed Angeles a picture of either the alleged victim or a co-defendant. Guzman testified that Morales Angeles confessed not only to the Knoxville car jacking, but also to a kidnaping in Tulsa. The interview continued for 2 to 2½ hours. The entire interview was conducted in Spanish. Guzman testified that he "had no question whatsoever" and that he never doubted that Angeles understood his rights. Angeles never asked to terminate the conversation.

### 2.) Cross Examination

#### A. *Francisco Angeles*

Attorney Smith questioned Guzman about the time period of the interview. Guzman testified that when he arrived at the office just after 7:00 p.m. that evening, Angeles was sitting in the interview room, handcuffed to his chair. Angeles complained that the handcuffs were too tight and

Guzman loosened them, but Angeles remained handcuffed for the interview. Guzman testified that each of the rights was read individually, and Angeles was asked if he understood after each one. Guzman stated that he might have read a few of the rights together, then paused to ask if Angeles understood. In any event, Guzman stated that defendant Angeles was asked 4 to 5 times whether he understood and he said that he did. Angeles did not ask any questions about the rights. Guzman did not ask anything of Angeles during the admonition of rights except whether Angeles understood, as to each one. Guzman reads the form to Angeles and then had Angeles read the form to the police.

Guzman testified that during the interview, Angeles remained unmoved except for once when he was taken to the restroom. Guzman said that Angeles did not appear intoxicated and did not smell like alcohol. Guzman then remembered that Angeles had told the officers he was thirsty and "we got him water." Guzman was only assigned to the task force that conducted this investigation for about three weeks. On redirect examination, Guzman testified Morales Angeles never indicated he did not understand his rights or the waiver.

## C. FINDINGS OF FACT

The Court finds that the testimony of Gregory and Guzman was not controverted by evidence or argument at the hearing and the credibility of neither witness was impeached. Accordingly, the Court finds that the testimony of Gregory and Guzman was credible and provides an accurate description of the events at issue, and constitutes the facts found in this matter.

## II: POSITION OF THE DEFENDANTS

### A. JOSE SANCHEZ

In his Motion to Suppress, Sanchez states that he was advised of his Miranda rights by the FBI agents who arrested him in Houston and that he told the agents he could read and write English

when they asked.  The agents had Sanchez read aloud a rights waiver form before signing it.  As he read the form, he had trouble with some of the words, especially "coercion."  Sanchez' trouble with the word "coercion" was noted on the attendant FBI form.  The same form says that the agents explained "coercion" to Sanchez, who then stated he understood its meaning and agreed to give a statement.  The Motion to Suppress describes this as the "if you can pronounce it you understand it" test, inadequate to demonstrate the level of understanding requisite to carry the government's "heavy burden" to establish a rights waiver.  Sanchez asked for opportunity to supplement his filings after an evidentiary hearing, which was grant.  However, he did not file an additional brief for the Court's consideration.

### B. FRANCISCO MORALES ANGELES

Morales Angeles (hereinafter Angeles) filed his original Motion to Suppress in [Doc. 38], which was supplemented by [Doc. 48] after further documents were provided by the government. Angeles also has filed a post-hearing brief at [Doc. 56].  Angeles challenges the admissibility of his statement principally on the ground that he is a Spanish-speaking person who was not capable of understanding his rights in order to provide a knowing, intelligent and voluntary waiver of them. Angeles argues that there is nothing in the record to indicate that he understood the Miranda rights or that he understood the significance of his signature on the rights waiver form.  Angeles asserts in his filings that the rights waiver form was only one of several forms he was asked to sign, and, having no experience with the criminal justice system, its significance was lost on him.

Angeles also challenges Gregory's initial questions about pictures, before the Miranda admonition by the Spanish-speaking agents.  Discussing Pennsylvania v. Muniz, 496 U.S. 582 (1990), Angeles argues that while an arrestee need not be advised of his rights before "routine

booking" questions are asked, here Gregory's questioning went to the substance of the criminal charges. Angeles also relies upon the Sixth Circuit's admonition that questioning during the booking process "should be carefully scrutinized. Even a relatively innocuous series of questions may, in light of the factual circumstances and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response." United States v. Avery, 717 F.2d 1020, 1025 (6th Cir. 1983). Angeles argues that Gregory's actions in showing him the investigative photographs during the booking process went beyond that which is permissible absent Miranda, distinguishing the facts of his own case from those presented in Oregon v. Elstad, 470 U.S. 298 (1985).

Angeles argues that the original taint of pre-Miranda questioning was not later cured by Guzman's Miranda admonition. Angeles argues that Guzman's admonition was not "a careful and thorough administration of Miranda warnings" required to cure the initial violation. The likelihood of a continuing negative impact on the defendant's understanding of his rights is only made worse by the fact that Angeles speaks Spanish. These facts combined within the totality of the circumstances indicate the government has not met its burden to demonstrate his voluntary, knowing and intelligent waiver of rights.

### III: POSITION OF THE GOVERNMENT

#### A. JOSE SANCHEZ

The United States responds at [Doc. 45], largely agreeing with the facts described by Sanchez. The government says the language in question reads:

> No promises or threats have been made to me and no
> pressure or coercion of any kind has been used against me.

The government response also describes that when he reached the word "coercion," reading aloud, the defendant had trouble pronouncing it. The government argues that the agent asked Sanchez if

he knew what the words meant and Sanchez replied that he did not. The response says, "[t]he agent documented his explanation of the word 'coercion' as meaning 'to feel forced, as if you had no choice ...'" Sanchez then said the understood the meaning and signed the rights waiver form. In a footnote, the government also asserts that even if the word "coercion" were stricken from the sentence, its meaning would be the same.

## B. FRANCISCO ANGELES

The government has filed responses to Angeles' arguments at [Doc. 52] and [Doc. 57]. The United States' position is that Angeles executed a knowing, voluntary and intelligent waiver of his Miranda rights after a full admonition in his native language. The government argues that in order to cure any arguable residual taint, Guzman was not required to inform Angeles that any prior, unwarned statements (to Gregory) could be used against him if he signed the rights waiver. The United States maintains, however, that the statements made by Angeles prior to the arrival of Guzman were not made in response to interrogation by Gregory. The United States argues that Gregory displayed the photographs while has was advising Angeles of the charges filed in Tennessee, as an aid in explaining Angeles' arrest. After Angeles commented on the photographs and started talking about the alleged offenses, Gregory specifically stopped the exchange and made Angeles wait for a Spanish-speaking officer to arrive in order to advise him of his rights. The government argues that Gregory told Angeles he could not make any more statements until this occurred. The government asserts that Angeles made efforts to continue his statement, which were refused by Gregory. The government relies heavily on the Supreme Court holdings in Oregon v. Elstad, 470 U.S. 298 (1985); and Missouri v. Seibert, 542 U.S. 600 (2004). The government asserts that Gregory's actions bore "none of the earmarks of coercion," as described in Elstad.

**IV: ANALYSIS**

A.        Miranda Standard

The voluntariness of confessions is protected by the Fifth Amendment's self-incrimination clause as well as the due process clause. Bram v. United States, 168 U.S. 532 (1897); Miranda v. Arizona, 384 U.S. 436 (1966). Involuntary confessions are obtained in violation of the privilege against compelled self-incrimination, since they are elicited from a person by means which deprive him of a free and rational choice. A suspect's statements provided in response to "questioning designed to elicit incriminating information from a defendant" are those which are subject to scrutiny under Miranda v. Arizona, 384 U.S. 436 (1966); see Rhode Island v. Innis, 446 U.S. 291, 300 (1980); Estelle v. Smith, 451 U.S. 454, 469 (1981);United States v. Murphy, 107 F.3d 1199, 1204-04 (6th Cir. 1997); United States v. Montano, 623 F.2d 147, 149 (6th Cir. 1980); United States v. Hurst, 228 F.3d 513, 759-60 (6th Cir. 2000); McGraw v. Holland, 257 F.3d 513, 518-20 (6th Cir. 2001).

In order to preserve the Fifth Amendment rights of the accused, the Supreme Court in Miranda v. Arizona, 384 U.S. 436 (1966) established a series of warnings of rights which police must give the suspect before they undertake interrogation. Miranda required that the suspect be warned that (1) he has the right to remain silent; (2) anything said by him may be used against him in a criminal prosecution; (3) he has the right to consult with an attorney; and (4) counsel will be appointed if he cannot afford to retain one himself. The Supreme Court further held that the rights contained in those warnings must be waived by the suspect in order for the interrogation to take place at all. See also Oregon v. Elstad, 470 U.S. 298 (1985); Edwards v. Arizona, 451 U.S. 477 (1981); Davis v. United States, 512 U.S. 452 (1994).

The giving of warnings and the requirement of a waiver are based on the presumption traditionally accorded by the Court against the relinquishment of constitutional rights. See Miranda v. Arizona, 384 U.S. 436, 475 (1966) (citing Johnson v. Zerbst, 304 U.S. 458 (1938), and Carnley v. Cochran, 369 U.S. 506 (1962) in support of same principle). There exists a considerable presumption against the waiver of rights, and any such waiver is found only when it is knowingly and intelligently made. North Carolina v. Butler, 441 U.S. 369, 373 (1966). The Supreme Court holds that the prosecution bears the burden of proving by a preponderance of the evidence that a defendant knowingly and intelligently waived his Miranda rights and that the statement was voluntary. Brown v. Illinois, 422 U.S. 590, 604 (1975); Colorado v. Connelly, 479 U.S. 157 (1986); Lego v. Twomey, 404 U.S. 477, 489 (1972).

The Supreme Court has read the Miranda decision to conclude that the Miranda requirements are simply "prophylactic" rules not required by the constitutional provision itself and meant as a procedural guarantee of the voluntariness requirement. New York v. Quarles, 467 U.S. 649, 654 (1984) (requiring "prophylactic" Miranda warnings before custodial interrogation provides practical reinforcement for Fifth Amendment rights against compulsory self-incrimination); Michigan v. Tucker, 417 U.S. 433 (1974)(holding that Miranda warnings were "procedural safeguards" and "were not themselves rights protected by the Constitution.")

When considering whether a confession is voluntary, the court looks at the totality of the circumstances to determine whether a defendant's will was overborne in a particular case; relevant factors include the defendant's age, his level of education and intelligence, whether he was advised of his rights, whether he suffered physical punishment and the length of the questioning he endured. Schneckloth v. Bustamonte, 412 U.S. 218 (1973); United States v. Craft, 495 F.3d 259 (6th Cir.

2007); <u>Ledbetter v. Edwards</u>, 35 F.3d 1062, 1070 (6th Cir. 1994).  A confession is "involuntary" if the police engaged in objectively coercive activity, the coercive activity was sufficiently severe to overcome the defendant's will and the defendant's statements stemmed from the coercion.  <u>United States v. Mahan</u>, 190 F.3d 416, 422 (6th Cir.1999).

B.        Waiver of Rights by Jose Sanchez

There is no allegation that Sanchez' statement was not voluntary, or that there was actual police coercion, rather he argues that the waiver elicited by police was not knowing and intelligent as required by the Fifth Amendment.    Sanchez does not assert that the police did not advise him of his <u>Miranda</u> rights at all; he argues that his understanding of the English language was such that he did not actually understand the warnings on the form or recited by Gregory.  In some instances, an express waiver of rights from one who *states* that he understands the rights does not itself establish that the waiver was knowing, intelligent and voluntary.  <u>See</u> <u>e.g.</u>,  <u>Garner v. Mitchell</u>, 502 F.3d 394, 413 (6th Cir. 2007) (<u>Miranda</u> waiver was not shown to be knowing and intelligent, given expert's interpretation of test result as showing lack of full comprehension of warnings.)  However, in this case, the uncontroverted facts before the Court are that Gregory handed an English rights waiver form to Sanchez, who appeared to understand English and whom he believed to speak English based on earlier investigation, observation at the scene of the arrest and the booking process. Sanchez read the form aloud, as requested.  When Sanchez indicated he did not know the meaning of one particular word, "coercion," it was explained in a reasonable manner, after which Sanchez stated aloud that he then understood the word's meaning.  Sanchez continued to read the form aloud, signed it and initialing alongside each right listed on the form, indicating he did understand.

The Court finds Agent Gregory's advice of <u>Miranda</u> rights was exemplary and thorough.

His treatment of the word definition was appropriate and in accordance with the dictates of the Supreme Court in <u>Miranda</u> and its progeny. Further, the Supreme Court has expressly declined to "require a precise formulation of the warnings given a criminal defendant." <u>California v. Prysock</u>, 453 U.S. 355, 359 (1981). <u>Miranda</u> is satisfied as long as "warnings reasonably convey to [a suspect] his rights." <u>Duckworth v. Eagan,</u> 492 U.S. 195, 203 (1989). The Court additionally finds the admonition carried the same effect without the inclusion of the word "coercion" at all. <u>C.f.</u>, <u>United States v. Cruse</u>, 59 Fed. Appx. 72 (6th Cir. 2003) (holding that the district court did not clearly err in finding that the college-educated defendant had knowingly and intelligently waived his rights under <u>Miranda</u>, by signing a waiver form so indicating, despite the defendant's testimony that "he neither read nor understood the waiver form before signing it"); <u>United States v. Sangineto-Miranda</u>, 859 F.2d 1501, 1518 (6th Cir.1988) (<u>Miranda</u> violation, without "earmarks of coercion" does not merit suppression where "all the evidence is that Mr. Sangineto was extremely agreeable and cooperative throughout the evening, much more so than his co-defendant ... apparently wanted him to be.")

The proof before the Court clearly indicates that defendant Sanchez understood his rights and the waiver of these rights and that such waiver was made knowingly and intelligently. The Court notes that although there was *argument* to the contrary, there was no *proof* or *evidence* offered to the contrary. The Court concludes that Sanchez' statement was given voluntarily and after a knowing and intelligent waiver of his <u>Miranda</u> rights.

C.      <u>Initial Statements by Francisco Angeles to Agent Gregory</u>

The Court finds the record does not clearly support a conclusion that Gregory was actually engaged in questioning of Morales Angeles when he was shown the photographs of the victim and

of himself during booking, and before Agent Guzman arrived.  The only proof or evidence before the Court is Gregory's testimony that Gregory merely showed Angeles the photographs while Gregory was advising him of the charges and that Angeles identified the victim Garcia in one picture and identified himself in another picture.  However, these statements were clearly made without the benefit of <u>Miranda</u> warnings and in a custodial setting.  The Court finds they went beyond ordinary routine booking questions.  The photographs were presented to defendant Angeles immediately after he was advised of the car jacking charges and after he was questioned about his identity and immigration status.  Although it does not appear that Agent Gregory actually asked specific questions about the photographs, the Court finds their presentation and use was far more than simply explaining the charges (as the government argues), but rather amounted to the functional equivalent of questioning or interrogation without <u>Miranda</u> protections.  As such, pursuant to <u>Rhode Island v. Innis</u>, 446 U.S. 291 (1980), the Court finds that Gregory either knew or should have known that showing such photographs to the defendant was likely to elicit an incriminating response.  If it was not done for that purpose, it had the same result and effect and the Court finds that such statements were reasonably likely under the circumstances and improper.  While the Court would ordinarily deem these un-Mirandized, unwarned, custodial statements to be inadmissible as evidence, the Court notes that the government has tacitly, though not directly, conceded this point in that the prosecution has agreed not to introduce at trial Morales Angeles' statements to Gregory regarding the photographs.   Response [Doc. 57 at page 5, fn.2).  Accordingly, in light of the government's agreement not to admit, or attempt to admit, any such statements, the issue regarding their admissibility is moot.

The record further reflects that Angeles later gave a "detailed" statement concerning the

events (discussed at § D, below).

D.        Waiver of Rights by Francisco Morales Angeles

This portion of the Court's Report and Recommendation relates to Morales Angeles' subsequent statements, after his arrest and booking by and with Agent Gregory; it relates to Morales Angeles' waiver of rights while with Agents Guzman and Munoz.  Angeles arguments against a valid waiver are similar to those made by Sanchez.  Angeles argues that because he does not speak English and only speaks Spanish, he lacked the ability to meaningfully understand the rights explained by Guzman in the brief review of the rights waiver form.  Angeles notes that the testimony at the hearing established that Guzman's review of the form and Angeles' silent reading of the form took place in only four minutes.  The defendant argues that the language barrier, along with the quick treatment of the rights waiver form and Angeles' inexperience with the American criminal justice system form a totality of circumstances under which the Court should not find a valid rights waiver.

However, the Court finds the subsequent interrogation was conducted after the defendant was carefully and thoroughly advised of his Miranda rights and he clearly acknowledged his understanding of the same.  See, Oregon v. Elstad, 470 U.S. 298, 312 (1985).  The circumstances of this also interrogation support a finding that Angeles' statement was made voluntarily after a knowing and intelligent waiver of his Miranda rights.  Guzman reviewed the rights waiver form with Angeles in Spanish and allowed him time to read it to himself.  Angeles asked no questions, signed the form and proceeded with his statement.  The Court finds that this was not the "'rare' case in which the defendant 'can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of Miranda."

20

United States v. Phillips, 230 Fed.Appx. 520, 523 (6th Cir. 2007) (quoting Berkemer v. McCarty, 468 U.S. 420, 433 n. 20 (1984)).  The Court further finds that Agent Gregory's decision not to question the defendant until he could have the defendant advised of his rights, in Spanish, by Spanish-speaking agents, along with the detailed description of a precise and specific line-by-line reading, the acknowledgment and understanding of the rights waiver by Morales Angeles, constitutes the "careful and thorough administration of Miranda warnings that serves to cure the condition that rendered the unwarned statement inadmissible." Oregon v. Elstad, 470 U.S. 298, 299 (1985).

The Court finds that the earlier showing of pictures by Agent Gregory had at most a de minimus impact on Morales Angeles' subsequent statement.  There is no evidence that the picture identifications were involuntary or the result of police coercion or even in response to actual interrogation, despite the fact that they occurred before a Miranda admonition.  The Court finds this argument is without merit.  "When neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." Oregon v. Elstad, 470 U.S. 298, 312 (1985).

**V: CONCLUSION**

For the foregoing reasons, the Court respectfully RECOMMENDS to the District Court that

Francisco Morales Angeles' Motion to Suppress Statement [Doc.38] be DENIED; and that Jose

Sanchez' Motion to Suppress [Doc. 22] be DENIED.[3]

Respectfully submitted,

_s/ C. Clifford Shirley, Jr.___
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).